### DANIEL DUNHAM *vs.* PRENTICE LAMPHERE.

An act regulating the time and manner of taking fish in the sea, within the territorial limits of the State, is within the authority of the state legislature, and binding on citi-zens of other states, and on vessels enrolled and licensed as fishing vessels under the laws of the United States.

ACTION OF TORT.    The facts of this case, which was argued by *L. F. Brigham,* for the plaintiff, and *T. D. Robinson,* for the defendant, are stated in the opinion, which was delivered at Nantucket at July term 1856 by

SHAW, C. J.    The facts upon which the decision of the pres-ent case depends are few and simple, and are in no respect con-troverted.    The right of fishing on the sea-coast, and in the bays, coves and arms of the sea, within the territorial limits of the State, and the power of regulating the fisheries within those limits, cannot fail to be regarded as subjects of deep interest by a maritime people, bordering, as this commonwealth to a great extent does, on the shores of the sea.

This is an action brought by the plaintiff as fishwarden of Nantucket, against the defendant, as the owner and master of a small fishing vessel, to recover a penalty alleged to have been incurred by the violation of a statute made for regulating cer-tain fisheries on the shores of Nantucket and several small islands adjacent.    The action is founded on *St.* 1850, *c.* 6.    The

first section provides that, from and after the 1st of July 1850, it shall not be lawful for any person to take any fish, by seining, within one mile from the shores of Nantucket, Tuckernuck, Smith's, Muskeeket and Gravel Islands. Section 2 relates to clams and horsefeet, and other bait, and is not applicable to this case. Section 3 declares a forfeiture of $50 for each offence. Section 4 authorizes the town of Nantucket to appoint fish-wardens, whose duty it shall be to prosecute for every offence. Section 5 authorizes the seizure of boats employed in violation of the act. And section 6 directs that all penalties shall go, one half to the treasurer of Nantucket and the other half to the complainant, and be recovered in an action of debt, in any court proper to try the same.

The declaration charges the violation of this law by taking fifty or more bass, by seining, on the 29th of July 1852, within one mile of Gravel Island.

The defendant, by his answer, alleges that he resides in Westerly, in the State of Rhode Island ; that in the summer of 1852 he came into this state, having obtained from the government of the United States a license to pursue in these waters the cod and other fisheries; admits that he took, as alleged, certain bass, as he thinks, within one mile of Gravel Island, by seining ; and alleges that in the act of seining he acted in pursuance of this license, and honestly believed that the legislature of this state had no right to interfere with and deprive him of his right acquired by such license. He afterwards made an additional answer, to this effect; that, whatever construction the court may give to his license, he will contend that the law of the State, above cited, is unconstitutional, and that the legislature of the State have no right to qualify or restrain the right of subjects of other states to fish in that part of the sea where the alleged seining took place.

The fact of taking fish by a seine within a mile of the shore of Gravel Island, which constitutes part of the territory of the State, after the act went into operation, is plainly contrary to the letter of the statute, and leaves the only question to be, whether the statute itself has the force of law. Being within a

mile of the shore puts it beyond doubt that it was within the territorial limits of the State, although there might in many cases be some difficulty in ascertaining precisely where that limit is. We suppose the rule to be, that these limits extend a marine league, or three geographical miles, from the shore; and in ascertaining the line of shore this limit does not follow each narrow inlet or arm of the sea; but when the inlet is so narrow that persons and objects can be discerned across it by the naked eye, the line of territorial jurisdiction stretches across from one headland to the other of such inlet. *Commonwealth* v. *Peters*, 12 Met. 387. *United States* v. *Bevans*, 3 Wheat. 336. " The jurisdiction of a state," says Marshall, C. J. in 3 Wheat. 386, 387, " is coextensive with its territory; coextensive with its legislative power." When it is doubtful whether an event occurred within or without this line, it is a question of fact, to be settled by proof; and this may sometimes make it a difficult question. But no such question of fact arises here. The only question is, and so it is ultimately put by the defendant in his answer, whether the act prohibiting fishing with seines, at the place in question, is constitutional, and such as the legislature had just power and authority to make.

The privilege and benefit of the fisheries on the shores and coasts of the sea has in all times been regarded as a valuable advantage, both as a means of subsistence and a source of commerce, in all civilized communities. Like other valuable commodities, fish, as well swimming as shell fish, are susceptible of being property; and every such thing, says Vattel, Bk. 1, §§ 234, 235, is considered as belonging to the nation that possesses the country, as forming part of the aggregate mass of its wealth; those not divided are called public property; they were denominated *res communes*, such as air, water, the sea, fish, wild beasts. Thus it appears that, though some commodities are more susceptible than others of specific appropriation and separate use and enjoyment, yet it is their utility and value, and not the specific appropriation to individuals or particular companies, which makes them property. They may be divided and appropriated, or held and used in common, as the sovereign

power to which they belong may determine to be most convenient and beneficial.

By the common law of England, now too well known to require any considerable citation of authorities, the right of fishing on the shores of the sea, and in all creeks and coves, is common to all the subjects of the realm, with a few exceptions where an exclusive right had been acquired by a grant from the king in very early times, or where special regulations have been made by act of parliament. Indeed, this subject has been so recently discussed by this court in the case of *Weston* v. *Sampson*, 8 Cush. 347, that it may be sufficient to refer to it, and the authorities there cited; for though the specific question there was the common right of digging clams, yet the inquiry necessarily involved the more general right of taking any and all kinds of fish on the shores and in the arms of the sea. In that inquiry we were led to the conclusion that, although the *jus privatum* or right of soil was in the king, yet it was so held in trust for the public; and that the right of fishing in the sea and in all the arms of the .sea, and in tide waters, was common to all English subjects.

Supposing then that the right both of property and dominion over the sea-shore, within the territorial limits of a sovereign state, and all its incidents—navigation, fishing and all other incidental benefits—belong to such sovereign state, to be divided among its members and held in severalty, or used and enjoyed in common, as the governing power of such state, constitutionally exercised, shall determine; then the question is, in these United States, where the governing power over the same people is constitutionally exercised in part by the general government of the United States, and in part by the several state governments, each supreme and exclusive within its proper and constitutional limits, whether the right of property and of dominion and government over the sea-coast fisheries, and all fisheries in tide waters and arms of the sea, belong properly to the general government, or remain with the state government.

This subject has lately undergone full discussion in this court, in considering a kindred subject, that of the nature and limits

of the rights of proprietors of lands bounding on the sea. *Commonwealth* v. *Alger*, 7 Cush. 53. It was considered and determined, on what we then conceived and still believe to be ample authority, that whatever right of dominion and sovereignty on this subject remained in the crown, whilst these states were colonies and provinces of Great Britain, and owed allegiance to the king, no right either of property or dominion remained after the acknowledgment of our independence by a treaty, sanctioned as it was by act of parliament. And we further determined that the dominion and controlling power over the sea-coasts, its shores and tide waters, thus absolutely renounced and relinquished by the government of Great Britain, and which must vest somewhere, did, as between the United States and the several states respectively, fully and absolutely vest in the several states. This had been definitively settled by the supreme court of the United States. *New Orleans* v. *United States*, 10 Pet. 662. *Pollard* v. *Hagan*, 3 How. 212.

One other point was considered in the case of *Commonwealth* v. *Alger*, 7 Cush. 82, 83, which may be of importance in this discussion ; and that turned on the distinction at common law between grants and other acts done by the king in virtue of his royal prerogative, and such as could rightfully be done by the general governing power of the kingdom, as exercised by parliament. Here no such distinction can be made, because no such prerogative exists. Whatever therefore has been or may be done by the governing power in this commonwealth—the legislature —is more analogous to acts of parliament establishing ports, or otherwise regulating common and public rights and interests, than to acts of the crown, under its prerogative. This distinction has no other application in this commonwealth than as it better enables us intelligently to apply the rules of the common law, and the principles afforded by English precedents, to cases arising within our own republican government.

The court are therefore of opinion that the right to the fisheries, and the power to regulate the use of the fisheries on the coasts and in the tide waters of the State, are left, in the distribution of powers between the general and state governments, with

the states, subject only to such powers as Congress may just y exercise in the regulation of commerce, foreign and domestic. That the exercise of both of these are not inconsistent, and therefore not in conflict with each other, was also settled by the supreme court of the United States, in the case of *Willson* v. *Blackbird Creek Marsh Co.* 2 Pet. 245.

Supposing then that the State, in its sovereign capacity, has full dominion and authority over the sea-shores of the State, is it within the legitimate authority and constitutional power of the state government, when such fisheries are left open for common use, to make and enforce laws designed to regulate the common use and enjoyment of the right of fishing, so as to preserve, enlarge and increase the benefit and profit of such fisheries ?

Upon such a question, which seems sufficiently plain, it may be well to look once more to those early authorities, to which we have been accustomed to look with respect, for the sources of our civil and social rights. Vattel, Bk. 1, § 246. This venerable writer says : " In virtue of the same authority [*i. e.* the dominion and power which every independent government has over all things within its territorial limits] the sovereign may make laws to regulate the manner in which common property is to be used." " Thus, the sovereign may establish wise laws with respect to hunting and fishing, forbid them in seasons of propagation, prohibit the use of certain nets, and of every destructive method, &c." I cite this authority the rather because it not only clearly announces the general principle, but illustrates it by the specific point in question.

The general rule, that the legislature have power to regulate the use and enjoyment of public and common rights, is founded on the plainest principle of fitness, and well established by authority And it is for the constituted authorities of the State to determine what regulations of this character will best promote the public and common benefit. In the case of *Bennett* v. *Boggs*, Bald. 60, it was held, that a law of Delaware, prohibiting the use of a gilling net in tide waters, within the limits of the State, was valid, and that the legislature had power to regulate the fisheries in the Delaware, by prohibiting the exercise of a common law right.

Indeed the laws intended to preserve fisheries by protecting fish in reaching their spawning places, and securing them there, are very numerous, both in England and in this country. In a very recent case, *Mayor &c. of Maldon* v. *Woolvet,* 12 Ad. & El. 13, Lord Denman, in commenting on a statute of 13 R. 2, *c.* 19, and declaring the opinion of the court that it is still in force, says, that " the preservation of the spawn, fry or brood of fish, has been for centuries a favorite subject of legislation, and the statutes passed for the purpose are extremely numerous." Certainly, similar acts, made upon similar considerations of expediency, and tending to preserve and secure the common right, have been frequent here, as well under the colonial and provincial governments, as under that of our present constitution. Anc. Chart. 114, 254.

The statute upon which this action is founded, being apparently made to prohibit a mode of fishing which might tend to interrupt the access of the fish to their spawning places, or otherwise tend to the injury of the fishery by the use of a destructive mode of taking them, of which the legislature are to judge, the court are of opinion, that it is a constitutional and valid act, and that the defendant, having violated its provisions, is liable for its penalties.

The defendant contends that, by the enrolment of his vessel as a coasting and fishing vessel, he derives some peculiar privileges, and insists that he has been licensed to carry on the fisheries in these waters. It is quite true that his vessel has been enrolled under the laws of the United States, pursuant to the provisions of the act of congress. The effect of this enrolment and license was, to give this vessel all the benefits and privileges of navigating the tide waters of the State, and such rights to bounty and other privileges as are given to fishing vessels by the laws of the United States; but it does not affect the present question.

In recurring to the defendant's answer, it will be perceived that he lays great stress upon the facts, that at the time of the alleged seining he was an inhabitant of another State, that he was master and part-owner of a fishing vessel, enrolled in conformity with the laws of the United States, and he insists on

this ground so earnestly, that it would seem that he and his legal advisers considered it the main ground of defence. At first we were led, from this statement of defence, to suppose that this act, like some others which have been passed in this commonwealth, contained provisions, prohibiting or impeding the citizens and inhabitants of other states in the enjoyment of rights and privileges allowed to our own citizens. But upon recurring to the act, it is clear that there are no discriminating provisions in favor of the citizens of this commonwealth, but that all the restraints and prohibitions of the statute operate in precisely the same manner on citizens of the Commonwealth and those of other states. We may fairly presume, therefore, that these enactments were all designed to preserve and improve the fishery, for the benefit of any and all persons entitled to enjoy the advantages of it. And surely those inhabitants of other states, who come within the territorial limits of this state, and thereby owe a temporary allegiance, and become amenable to its laws, have no just reason to complain, if, when within those limits, and enjoying benefits in common with our own citizens, they are bound to conform to a salutary law, necessary for the common good. It deprives them of no benefit or privilege which the constitution and laws of the United States could give, or do profess to give them—that of a free navigation in and over all the navigable waters of the State.

This answer is satisfactory, and quite sufficient to meet and obviate the claims of right, on which this defence is founded. But 't might lead to an implication that, if this act had made a discrimination in favor of the inhabitants and citizens of this commonwealth, and against citizens of other states, our opinion would have been otherwise ; and as there are many such acts on our statute book, we have thought it due to the rights of the people of the State, to say something to avoid this implication.

It has been contended, and with some plausibility, that any act of the State which should give to our own inhabitants a right of fishing in the sea, within our own territorial limits, and prohibit the same to the citizens of other states, or allow them to participate in it only upon the payment of some tax

Dunham *v.* Lamphere.

or duty, would be obnoxious to § 2 of art. 4 of the Constitution of the United States, which declares that " the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states."

We believe that this question has not been directly decided by the supreme court of the United States. It was raised in the circuit court many years ago, before Mr. Justice Washington, who decided, upon grounds which appear plausible, if not satisfactory, that the right of fishing is in the nature of a right of property, incident to the right of territory, and that the governing power of the State has a just right to appropriate it, either by assigning portions to be held by riparian proprietors or other individuals or companies in severalty, or by ordering it to be held to the common and general use of the inhabitants of the State, as such state should by its laws determine. He was also of opinion that the privileges and immunities, which the citizens of each state should enjoy in every other, were of a different character, and would not be infringed by such a law. *Corfield* v. *Coryell*, 4 Wash. C. C. 380. A similar decision has been made in that circuit by Mr. Justice Baldwin. *Bennett* v. *Boggs*, Bald. 60.

In deciding this case, therefore, on the ground that the act on which it is founded makes no discrimination in its prohibitions between the inhabitants of other states and those of this commonwealth, we wish not to be understood as implying that, if the law had been otherwise, it would have been unconstitutional. Until it has been directly determined by the supreme court of the United States that such a law, appropriating the coast fisheries within the territorial limits of the State to the inhabitants of the Commonwealth, is repugnant to the Constitution of the United States, and void, it must be deemed an open question, to be decided by the competent tribunals, when it arises.

*Judgment for the plaintiff.*[*]

---

[*] S. P. *Smith* v. *Maryland*, 18 How. 71. *The State* v. *Medbury*, 3 R. I. 138.